KARL and wife, Plaintiffs-Respondents, v. EMPLOYERS INSURANCE OF WAUSAU, and others, Defendants-Appellants.

*No. 741 (1974). Argued January 3, 1977.—Decided June 1, 1977.*
(Also reported in 254 N.W.2d 255.)

286

For the appellants there was a brief by *Foley & Cap-well, S. C.* and oral argument by *Rex Capwell,* all of Racine.

For the respondents there was a brief by *Alan M. Clack, Robert H. Bichler, Dennis J. Barry* and *Thomp-*

*son & Coates, Ltd.* and oral argument by *Mr. Bichler*, all of Racine.

DAY, J. The questions raised on this appeal are principally whether the evidence supports the jury apportionment of negligence between the plaintiff, Mrs. Karl and the defendant, Mr. Duddles, whether the court erred in the admission of certain medical testimony, and whether the amount of damages awarded to the plaintiffs is supported by the evidence.

On September 10, 1968 Mrs. Karl was traveling west on Highway 20 in Racine county on her way home. The defendant, Mr. Duddles, was traveling east on Highway 20 going toward Racine. At the intersection of 20 and Highway 31, according to Mrs. Karl's testimony, she stopped at a red light in the left turn lane preparing to turn left onto Highway 31. She testified that as she approached this intersection the light was red, and followed by a green arrow. On the arrow, she made her turn. She said she never saw the car that Mr. Duddles was driving and she also testified on cross-examination that she was sure that she did not make a turn on the green light but on the green arrow. Another vehicle was in the opposite left lane perparing to turn north onto Highway 31. As Mrs. Karl proceeded across the highway, she was hit by the car driven by Mr. Duddles.

The speed limit on Highway 20 was 50 m.p.h. but approximately a block or a block and a half from the intersection the speed limit changed to 30 m.p.h. according to Duddles. He testified he stayed within the posted limits and had a green light as he approached the intersection. He said he remembered seing Mrs. Karl's car approach the intersection and stop but he had no recollection of seeing it go into the turn.

Several witnesses testified Mr. Duddles was speeding.

Robert Greco who was driving an electric company truck east on Highway 20 was passed by Mr. Duddles in the left lane. Mr. Greco testified that he was traveling the posted speed of 50 m.p.h. because he thought a police car was following him. The car following Mr. Greco turned out to be an animal control truck on an emergency run.

Bernard Reske, driving the animal control truck, said he was traveling 65 m.p.h. when the Duddles car passed him. He pursued the Duddles car because he wanted to get the car's license number and radio ahead to the police because of the speed at which Duddles was traveling. Mr. Reske testified the Duddles car did not slow down as it entered the intersection and that the light was red. He saw the Karl car making the turn and testified, "She did not have a chance when she proceeded into the intersection, he was on top of her." Thomas Worcester, a deputy sheriff from Racine County, was driving a school bus north on Highway 31. He stopped at the intersection for a red light and saw the Duddles car approach at approximately 50 to 55 m.p.h.

Donald Vesselik, Sr., was pumping gas at a filling station near the intersection and testified that a customer remarked at the time of the crash that a man went through the red light.

The sequence of lights at and before the accident became an issue during the trial. In response to questions, Mrs. Karl's testimony indicated that the light went from a red to a green arrow and that she turned on the green arrow. John White, the district chief maintenance engineer of the Division of Highways, described the light sequence in operation at the intersection as being a "trailing arrow," starting with red, followed by green, yellow, green arrow, yellow arrow and red; he said the green arrow would not immediately follow the red light.

The jury, however, was entitled to believe Mrs. Karl turned on the green arrow. Based on the foregoing testimony, we conclude there was credible evidence in this record to support the jury's allocation of negligence at ninety-five percent to the defendant and five percent to the plaintiff.

The defendant also claimed error on the part of the trial court for its failure to give Wisconsin jury instruction, civil, 1070 on failure to see an object in plain sight.

In motions after verdict the trial court pointed out there was no evidence Duddles car was in plain sight when Mrs. Karl started to negotiate her turn. Duddles testified that his view of the plaintiff was obstructed by presence of other vehicles in his line of vision. In addition, the plaintiff testified she remembered nothing after she started making her turn. The trial court did give the standard lookout instruction. Because there was no evidence Mrs. Karl failed to see that which was in plain sight, the standard instruction adequately covered the pertinent conditions raised in the testimony. Failure to give Wis. J I—Civil 1070 was not error. *Cf., Rowden v. Family Ins. Co.,* 48 Wis.2d 25, 29, 179 N.W.2d 900 (1970).

Following the accident, Mrs. Karl was taken to St. Luke's Hospital in Racine where she remained until October 4th. Diagnoses were cerebral concussion, multiple contusions and abrasions and cervical myocitis. Dr. Tsuchiya, a consultant, testified Mrs. Karl sustained a cerebral concussion and "whiplash" injury to the neck (cervical sprain). After her discharge from the hospital Mrs. Karl saw Dr. Yale Gerol, a neurological surgeon. He said he did not find evidence of any major injury to the brain, spinal cord, or the nerves leading from the brain or spinal cord. He recommended that Mrs. Karl

see a psychiatric social worker associated with his clinic, which she did. The social worker terminated her involvement in the case in December 1968 because she felt that Mrs. Karl's family relations had improved.

It is undisputed that Mrs. Karl had severe emotional problems at various times in her life. What part the accident involved here contributed to these problems was a major issue of fact throughout the trial.

On the basis of an October 8, 1968 examination, Dr. Gerol concluded Mrs. Karl was fairly well when she returned from the hospital but soon developed a severe anxiety reaction, acute depression and the fear of being alone. Mrs. Karl said, in addition, she felt pain most of the time. In December 1970, the Karls' son took his own life and the body was discovered by Mrs. Karl. She and her daughter testified that this event actually made Mrs. Karl stronger. Mrs. Karl said, "I could not let myself get depressed." Earlier in December, prior to the incident involving her son, Mrs. Karl began to see a Milwaukee psychiatrist, Dr. Herbert J. Apfelberg, whose deposition was read to the jury. He said that prior to the collision, Mrs. Karl, wife of twenty-three years and mother of six children, was quite capable and socially holding her own. He found a "distinct causal connection" between the injuries received and the creation of a neurotic condition. Neurological tests showed impairment of the nervous system related to the cerebellum of the central brain. His diagnosis, based on both psychiatric and neurological examination, was that Mrs. Karl suffered mixed depressive and anxiety neurosis and post-concussion syndrome. By September 1974, he stated, there was a considerable degree of improvement but still signs that she was not completely recovered. An emotional disturbance which the doctor attributed to the collision was still present and was seen as "probably permanent."

On cross-examination, Dr. Apfelberg was asked whether the alleged long-standing history of family prob-

lems was a primary contributor to Mrs. Karl's problems. Dr. Apfelberg maintained that she suffered from an organically impaired nervous system resulting from brain injury.

The defense also called Dr. Harold T. Schroeder, a Racine psychiatrist, who examined Mrs. Karl one week before the trial began. During his examination Mrs. Karl was tense, anxious, near tears and generally uncommunicative. He testified a psychological test administered at that time, known as a Minnesota Multiphasic Inventory, revealed chronic complaints of anxiety which converted into physical problems. She was described as having a hysteroid personality. On cross-examination, Dr. Schroeder conceded the automobile collision was a precipitating factor in her later depression and undoubtedly aggravated pre-existing symptoms.

In rebuttal, the plaintiffs called Dr. Walter T. McDonald, a psychologist, to rebut findings based on the Minnesota Multiphasic Inventory examination.

The defendants allege the trial court erred in refusing to restrict plaintiffs' cross-examination of Dr. Schroeder and direct examination of Dr. McDonald.

The source of alleged error concerning the cross-examination of Dr. Schroeder is that plaintiffs' counsel accompanied Mrs. Karl when she submitted to Dr. Schroeder's examination. This presence, unknown to the defendants when the examination took place, was allegedly prejudicial. Defendants moved that the cross-examination of Dr. Schroeder be limited so as not to touch upon those portions of the examination that counsel for the plaintiffs observed and heard.

This court has stated the presence of a personal injury claimant's counsel at an independent medical examination is a matter resting within the sound discretion of the trial court. *Whanger v. American Family Mut. Ins. Co.,* 58 Wis.2d 461, 470, 207 N.W.2d 74 (1973). The court

set forth guidelines at 58 Wis.2d 471 for the exercise of that discretion which indicate counsel will not attend unless the court determines otherwise.

"Independent medical examinations are not adversary proceedings per se but rather investigation and preparation for trial. Opposing counsel's presence is not necessary and ordinarily he can add nothing to the adequacy of the examination. There may be instances where the character, personality or sophistication of the personal injury claimant are such that his counsel could give him assurance and confidence and assist in communicating so as to be beneficial to the examining physician and provide for a more accurate examination. There also may be instances of hostility between the physician and the claimant, or reluctance or fear on the part of the claimant. In these and other situations where a need or prejudice is established, counsel should be permitted to be present. However, the burden to show need or prejudice should be upon the claimant. If need or prejudice is shown, the court then, in the exercise of its discretion, can order the presence of counsel upon such terms as may be just."

Plaintiffs argue the fact the examination was by stipulation rather than pursuant to the statutory right of sec. 269.57(2), Stats. 1973[1] removes this case from the guidelines of *Whanger*.

However, under the reasoning of *Terpstra v. Soiltest, Inc.*, 63 Wis.2d 585, 218 N.W.2d 129 (1974), we hold the rule stated in *Whanger* is the same when examination is by stipulation. In *Terpstra* the court considered whether examination pursuant to a medical authorization given voluntarily was subject to the sanctions of sec.

[1] "269.57 *Inspection Of Documents And Property; Physical Examination Of Claimant*. . . . (2)(a) The court . . . may . . . in any action brought to recover for personal injuries, order the person claiming damages for such injuries: 1. To submit to a physical examination . . ." (Now see sec. 804.10, Wis. Stats. 1975.)

269.57 (3) (1971), which provides for the exclusion from evidence of reports of a physical examination made for an adverse party when such adverse party refuses to turn over copies of such report to the claimant's counsel in advance of trial. At 63 Wis.2d, page 596, the court said:

"The medical authorization provided the same remedy to the defendants as they would be afforded under sec. 269.57, Stats. The authorization, however, obviated the necessity of securing a court order. In order to encourage the use of such authorizations and to avoid the consumption of unnecessary trial court time, the sanctions afforded by sec. 269.57 may be invoked when there is a failure to comply with conditions of the authorization that are consistent with the statutory remedies."

Under the reasoning of *Whanger,* the defendants had the right to assume plaintiffs' counsel would not be present at the independent examination, having no notice to the contrary. Based on the record before us, however, it is clear that the presence of counsel was not prejudicial and the trial court did not abuse its discretion in refusing to limit cross-examination. Dr. Schroeder did not express any dissatisfaction with counsel's presence. He testified that during the interview Mrs. Karl was tense, anxious and near tears. There is no suggestion that her lawyer's presence was the cause of her anxieties. In view of her fearful state at the time, the court would have been justified in allowing the presence of her counsel had such request been made under the principles set forth in *Whanger, supra.*

Dr. McDonald, a specialist in behavioral disorders, was called as a rebuttal witness by the plaintiffs. He testified the Minnesota Multiphasic Inventory administered to Mrs. Karl was inaccurately scored. He also challenged the diagnosis, based in part on that test, that she had a hysteroid personality.

The defendants raise three points of alleged error in the admission of Dr. McDonald's testimony. First, the claim is made that his testimony exceeded the scope of proper rebuttal; second, that as a psychologist, he was not competent to render opinions as to Dr. Schroeder's medical diagnosis; and third, that the plaintiffs had not listed Dr. McDonald as an expert witness in compliance with the pre-trial order.

The allegation that Dr. McDonald developed new theories and contributed new psychiatric evidence in his rebuttal testimony is not supported by the record. He testified plaintiff had a "traumatic neurosis or traumatic phobia reaction attributed to the accident." Plaintiffs are correct in stating that the issue in the case from the beginning and throughout the trial was whether Mrs. Karl suffered traumatic neurosis as a result of the accident. Dr. Apfelberg, whose deposition testimony was part of the plaintiffs' case, stated Mrs. Karl suffered from a "mixed anxiety and depressive type of neurosis" as a result of the accident.

The defendants' own expert, Dr. Schroeder, testified Mrs. Karl suffered from overwhelming fear precipitated at least in part by the accident.

"The general rule is that the plaintiff, in his rebuttal, may only meet the new facts put in by the defendant in his case in reply. This rule is not inflexible and the court may in its discretion allow or refuse to receive such evidence. An exception is generally made when the evidence is necessary to achieve justice."

*Rausch v. Buisse,* 33 Wis.2d 154, 167, 146 N.W.2d 801 (1966). *Accord, State v. Watson,* 46 Wis.2d 492, 499, 175 N.W.2d 244 (1970). Clearly, the trial court acted within its discretion in allowing the rebuttal testimony concerning these issues.

As to the defendants' second contention with respect to the testimony of Dr. McDonald, we hold that it was not error for the court to permit Dr. McDonald to refute Dr. Schroeder's testimony even though Dr. McDonald was not a physician.

Sec. 907.02, Wis. Stats. (1973) provides:

"Testimony by experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The qualification of an expert has historically been a matter not of licensure, but of experience. *Casimere v. Herman*, 28 Wis.2d 437, 442, 137 N.W.2d 73 (1965). In *Green v. Rosenow*, 63 Wis.2d 463, 470, 471, 217 N.W.2d 388 (1974) this court reaffirmed the holding of *Casimere* that "the law traditionally has permitted limited testimony of a medical nature by one not licensed as a medical doctor, if he is, in fact, qualified as an expert."

This court also has held a qualified psychologist may testify as to mental condition. We said in *Roberts v. State*, 41 Wis.2d 537, 551, 164 N.W.2d 525 (1959):

". . . It is the particular qualification of the witness in relation to the particular issue which should control, rather than the label of a profession or trade."[2]

*Casimere, supra*, at 28 Wis.2d 441, points out the problem when a psychologist testifies as to "future pain and suffering or in regard to other aspects of a personal injury case having medical implications when the testimony is not used as an adjunct to the testimony of a

[2] *See, generally*, 1970 WIS. L. REV. 989, 995.

licensed physician or psychiatrist." But Dr. McDonald's testimony paralleled that of Drs. Apfelberg and Schroeder. Dr. Apfelberg lived in Milwaukee at the time he was deposed but no longer lived in Wisconsin at the time of the trial and was thus unavailable for rebuttal testimony. The thrust of Dr. McDonald's testimony was a challenge to the accuracy of the personality test score relied on by Dr. Schroeder and administered less than two weeks before trial. The defendants have not objected to this line of testimony.

Defendants also claim as error the admission into evidence of a written report of Dr. G. N. Gillett, the Karls' family physician. Dr. Gillett had been listed as an expert who might be called to testify on plaintiffs' behalf. He did not appear at the trial. It was at the close of recross-examination of the defendants' expert, Dr. Schroeder, that counsel for plaintiffs asked him whether he relied in part on reports written by Dr. Gillett. Dr. Schroeder answered, "yes, I did, I did review it." The report was dated June 27, 1969. Based on Dr. Schroeder's stated reliance on the report, plaintiffs moved its admission into evidence. The report detailed Mrs. Karl's condition based on Dr. Gillett's examination. He found no evidence of a fracture or a dislocation but did write she suffered "a severe whiplash injury" with a short period of unconsciousness. The trial court admitted the report[3] on the authority of this court's decision in *Vinicky v. Midland Mut. Casualty Ins. Co.*, 35 Wis.2d 246, 151 N.W.2d 77 (1967) wherein this court said:

". . . whenever it becomes apparent that a medical expert relies on the reports of other physicians or experts not in evidence, those reports may in their relevant and competent portions be introduced by the adverse

[3] A second report by Dr. Gillett in letter form written to defense counsel was read to the jury at the request of the defendants.

party into evidence for the purpose of impeachment and in the interests of verbal completeness."

The defendants argue that the rule as expressed in *Vinicky* was only intended to allow the party adverse to the person whose report is being offered to use the report for impeachment or verbal completeness. They state the rule was not intended to be a substitute for a live witness subject to cross-examination nor a source of substantive evidence. They argue that a "grave danger" is posed by the use of such reports, if admitted as a matter of course, resulting in experts no longer testifying at trials.

Wisconsin has long held it proper for a physician to make a diagnosis based in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others. *Leora v. Minneapolis, St. P. & S. S. M. R. Co.*, 156 Wis. 386, 395, 146 N.W. 520 (1914) ; *Sundquist v. Madison Railways Co.*, 197 Wis. 83, 87, 221 N.W. 392; *Vinicky*, 35 Wis.2d at 254; sec. 907.03, Wis. Stats. (1973).[4]

Sec. 907.03, Stats. allows the expert to rely on inadmissible evidence if it is a type "reasonably relied upon by experts in the particular field." The rule follows the rationale of *Sundquist, supra,* where at 197 Wis. 87, this court said:

"In order to say that a physician, who has actually used the result of those tests in a diagnosis and in the treatment of the plaintiff, may not testify what that

[4] "907.03  *Bases Of Opinion Testimony By Experts.*  The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

diagnosis was, the court must deliberately shut its eyes to a source of information which is relied on by mankind generally in matters that involve the health and may involve the life of their families and of themselves, —a source of information that it is essential the court should possess in order that it may do justice between these parties litigant.

"In making a diagnosis for treatment physicians must of necessity consider many things that do not appear in sworn proof on the trial of a lawsuit,—things that mean much to the trained eye and touch of a skilled medical practitioner. This court has held that it will not close the doors of the courts to the light which is given by a diagnosis which all the rest of the world accepts and acts upon, even if the diagnosis is in part based upon facts which are not established by the sworn testimony in the case to be true. *Leora v. M., St. P. & S. S. M. R. Co.,* 156 Wis. 386, 395, 146 N.W. 520."

*Vinicky* held that facts relied on by the expert may be admitted for the limited purpose of impeachment and verbal clarity. If a party's expert relies on certain data, "fair play" requires that the opponent may show that the data relied on did not support the conclusions of the testifying expert, or that the data relied on contained information ignored by the testifying expert. *Vinicky,* 35 Wis.2d at 255. The defendants misanalyze *Vinicky* however, when they argue that the case allows the admission of the report by the party adverse to the person whose report is being offered. The person being impeached is the witness. *Vinicky* permits admission of the report by the party adverse to the witness. This is what occurred in the instant case. We further note that the report of Dr. Gillett was cumulative to the testimony of Dr. Apfelberg. As such, it was not prejudicial. *Vinicky,* 35 Wis.2d at 257.

We find no support for defendants' argument that the absence of Dr. Gillett entitled the defendants to the absent-witness instruction. Wis J I—Civil 410 reads:

"410 *Witness: Absence.* You are instructed that if a party fails to call a material witness within his control, or whom it would be more natural for that party to call than the opposing party, and the party fails to give a satisfactory explanation for his failure to call the witness, then you may infer that the evidence which he would give would be unfavorable to the party failing to call him."

This court has recently stated there must be a showing, before the absent-witness instruction is appropriate, that there is a reasonable relationship between the failure to produce the witness and the inference that the testimony, had it been placed before the jury, would have been unfavorable to the party's cause. *Featherly v. Continental Ins. Co.,* 73 Wis.2d 273, 282, 243 N.W.2d 806 (1976) ; *Ballard v. Lumbermens Mut. Casualty Co.,* 33 Wis.2d 601, 613, 616, 148 N.W.2d 65 (1967). No such showing was made in this case.

A related argument is the claim of the defendants that they were prejudiced by plaintiffs' failure to call Dr. Gillett after he had been listed by plaintiffs as an expert pursuant to pre-trial order. Defendants state they could not subpoena Dr. Gillett on their own because he had left town by the time they learned he would not be called by the plaintiffs. As a result, they argue they were denied an opportunity to cross-examine and test the validity and accuracy of the opinions and conclusions contained in Dr. Gillett's written report.

Dr. Gillett's statement was admitted because of the reliance placed on it by defendants' witness. If the defendants wished to have Dr. Gillett present, they could have subpoenaed him. It is not grounds to grant a new trial merely because an expert listed under a pre-trial order by one of the parties is not called as a witness at the trial.

The jury awarded Mrs. Karl's husband $2,300 for past medical expenses. The defendants' claim that the court erred in refusing to admit into evidence proof that Mr. Karl had already recovered at least part of these expenses from his insurer and also claim the court erred in refusing to reduce the judgment by that amount under *Heifetz v. Johnson*, 61 Wis.2d 111, 211 N.W.2d 834 (1973). By way of offer of proof, the defendants put in the record an interrogatory answer by Mrs. Karl in which among other things she states, "St. Luke's tells me that Blue Cross paid $1,683.93 towards its bill for me . . ."[5]

The defendants failed to produce the alleged contract of insurance between the Karls and their hospital insurer even though they had from the third day of December 1970 until the time of trial to pursue the matter. Neither the trial court nor this court has been apprised of the nature of the particular insurance contract, whether it had a subrogation clause, or whether subrogation was waived. Because of the state of the record we find no error in the refusal of the trial court to reduce the judgment by the amount of the alleged insurance recovery.

Finally, defendants request a new trial in the interests of justice or alternatively a reduction of damages under *Powers v. Allstate Ins. Co.*, 10 Wis.2d 78, 102 N.W.2d 393 (1960). The defendants point to the fact that Mrs. Karl broke down on the witness stand as evidence the jury was misled by passion, prejudice and sympathy. The record reveals she broke down under a probing cross-examination by defense counsel who had earlier

[5] Defendants in their brief state the sum paid by the insurer is $1,963.63 but do not cite to the record. The defendants also claim they have the right to show this collection from the insurer to the jury because part of their theory was that the "claimed injury . . . involved . . . a possible 'secondary gain.'"

stated in chambers that he knew he was dealing with "a psychotic case." Counsel knew what he was doing in his cross-examination and nothing occurred with respect to Mrs. Karl on the stand that was inconsistent with the descriptions given of her condition by the medical experts whose testimony was also presented to the jury.

The jury awarded Mrs. Karl the sum of $80,000 for pain, suffering and disability, past and future, and $1,000 for loss of earnings.

██ The trial court pointed out that under *Redepenning v. Dore*, 56 Wis.2d 129, 130:

"A verdict is perverse . . . when the jury clearly refuses to follow the direction or instruction of the trial court upon a point of law, or where the verdict reflects highly emotional, inflammatory or immaterial considerations, or an obvious prejudgment with no attempt to be fair . . ."

██ Under these criteria, the trial court on the basis of this record very properly found that it could not find perversity in the verdict. As the trial court stated, "The record reflects no foundation for a conclusion that the jury ignored or refused to follow instructions, that it acted under the stress of emotion, inflammation, or immaterial considerations. The verdict does not demonstrate prejudgment or the absence of attempted fairness." With this conclusion, we agree. As the trial court pointed out, the accident occurred on September 10, 1968. Mrs. Karl sustained a period of unconsciousness and remained in the hospital until October 4th of 1968. While hospitalized, she experienced pain, discomfort, light headedness, and occasional loss of consciousness. After her release from the hospital, she described persistent pain, headaches, stiffness, numbness of hands and feet, fear

of being alone and inability to do household tasks for six months. These symptoms were stated to persist at the time of trial at which time she complained of headaches, neck trouble and occasional dizziness. Dr. Apfelberg described her condition as "mixed anxiety and depressive type neurosis, distinctly, causally connected to the accident." The same doctor noted that her movements were slow and poorly coordinated, tendon reflexes diminished and that she had sustained an impairment of the central nervous system.

The trial judge observed that at the time of trial, "Mrs. Karl was obviously and critically ill." This fact was the subject of comment, in the presence of the jury, by counsel for the defense who appeared to direct the principal thrust of interrogation to the question of the causal connection between the accident and Mrs. Karl's manifested illness.

On the basis of this record, the jury was justified in the damage verdict which it awarded. The trial court fully reviewed the evidence in response to the motions after verdict and concluded that the damage award was not excessive. The question on review is whether this determination was an abuse of discretion.

As this court said in *Gervais v. Kostin*, 48 Wis.2d 190, 201, 179 N.W.2d 828 (1970):

"The initial determination of the adequacy or excessiveness of an award is to be made by the trial court on motion after verdict. The trial court must then view the evidence in the light most favorable to the jury verdict and determine if there is any credible evidence. Then the question on review is simply whether the trial court abused its discretion in concluding that the credible evidence supported the verdict and not what the supreme court would have awarded had the question of damages been before it initially.

"Under the above circumstances great weight is given to the trial court's approval of reasonableness of the damage award . . ."

See also, *Murawski v. Brown*, 51 Wis.2d 306, 316, 187 N.W.2d 194 (1971); *Kobelinski v. Milwaukee & S. Transport Corp.*, 56 Wis.2d 504, 525, 202 N.W.2d 415 (1972). The trial court here has extensively reviewed the record with respect to the injuries and their cause and we agree with the trial court that the verdict must be sustained.

*By the Court.*—Judgment affirmed.

